Case 1:13-cv-00544-HG-RLP Document 112-13 Filed 12/19/14 Page 1 of 74 PageID #: 2239

Aaron Million, Desig. Witness of
Municipal Services Bureau

1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF HAWAII
2

3    REED SAILOLA,                      *
               Plaintiff,               *
4                                       *
     VS.                                *         CASE NO.
5                                       *   1:13-cv-00544 HG-RLP
     MUNICIPAL SERVICES BUREAU          *
6    AND                                *
     JOHN DOES (1-50),                  *   JURY TRIAL REQUESTED
7              Defendants.              *

8

9    ****************************************************

10           ORAL AND VIDEOTAPED DEPOSITION OF

11             DESIGNATED WITNESS OF
               MUNICIPAL SERVICES BUREAU
12                  AARON MILLION

13               NOVEMBER 20, 2014

14   ****************************************************

15

16           ORAL AND VIDEOTAPED DEPOSITION OF AARON

17   MILLION, produced as a witness at the instance of the

18   Plaintiff and duly sworn, was taken in the above styled

19   and numbered cause on the 20th day of November, 2014,

20   from 12:05 p.m. to 8:02 p.m., before GERRI C. RICHARD,

21   CSR in and for the State of Texas, reported by machine

22   shorthand, at the law offices of Smith, Robertson,

23   Elliott & Douglas, LLP, 221 West 6th Street, Suite 1100,

24   Austin, Texas, pursuant to the Federal Rules of Civil

25   Procedure.
```

Aaron Million, Desig. Witness of
Municipal Services Bureau

1     Q.    Okay.  So 3.2.22 and 3.2.23 are the only

2   provisions that talk about that determination?

3     A.    To the knowledge that's available to me, yes.

4     Q.    All right.  Now, the judiciary also states that

5   nonrestitution debts would be sent to the collector

6   electronically, doesn't it?

7     A.    Is that --

8     Q.    It's on Page 7.

9     A.    Okay.  Do you want to point me to that area

10  or --

11    Q.    Yeah.  3.2.1.

12    A.    Yes.

13    Q.    Okay.  And it requires the collector to have

14  the ability to obtain the transferred data

15  electronically?

16    A.    Uh-huh.

17    Q.    Is that how MSB received Mr. Sailola's data?

18    A.    Yes.

19    Q.    Now, was Mr. Sailola's data part of a batch of

20  data or was it only his one account?

21    A.    It was part of a batch of data.

22    Q.    Okay.  And what data is included in that data

23  transfer?

24    A.    I believe we -- I believe we produced a

25  redacted copy of the placement file.  If I could review

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 3 of 74   PageID #: 2241

Aaron Million, Desig. Witness of
Municipal Services Bureau

67

1    Q.    But in any event, you've got one phone number

2    in this transfer.  Correct?

3    A.    That -- let me just read it.  It's not the

4    easiest thing to read.  Yes, one phone number.

5    Q.    Okay.  Is this the only time that MSB has ever

6    collected against Mr. Sailola?

7    A.    To my knowledge.

8    Q.    Have you looked?

9    A.    We looked at -- we looked for his name,

10   obviously, in our system and this was the record that

11   appeared.

12   Q.    Okay.  And you didn't find any other records.

13   Correct?

14   A.    I did not find any records, no --

15   Q.    And this --

16   A.    -- any other records.

17   Q.    -- specifically refers to the case number.  It

18   is hard to read.  1DTA-11 --

19   A.    Yeah.

20   Q.    -- 03671?

21   A.    Yes.  That's correct.

22   Q.    All right.  The violation date there at the

23   bottom is 8-7-11?

24   A.    Yes.

25   Q.    And this only refers to that case number for

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 4 of 74   PageID #: 2242

Aaron Million, Desig. Witness of
Municipal Services Bureau

68

1    the purported offense that occurred that day of 8-7-11.

2    Correct?

3        A.    That's correct.

4        Q.    It doesn't involve any other citations or any

5    other issues that Mr. Sailola may have had?

6        A.    Which information?

7        Q.    Well, I mean, this -- this placement file.

8        A.    Uh-huh.

9        Q.    I mean, this is only to collect on that case.

10   Correct?

11       A.    This information is used to collect on this

12   case.

13       Q.    That's correct.

14       A.    Yes.

15       Q.    Not other cases?

16       A.    I don't know if Hawaii uses this information to

17   collect on other cases or not, but we use this

18   information to collect on this case.

19       Q.    Okay.

20       A.    Yes.

21       Q.    And you don't use this information to collect

22   on any other case against Mr. Sailola?

23       A.    We don't have any other case for Mr. Sailola.

24       Q.    That's what I'm getting at.  So you -- the only

25   case that you're aware of that you have ever collected

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    against Mr. Sailola is the 1DTA-11-03671 case?

2        A.   That I'm aware of, yes.

3        Q.   Okay.  All right.  Now, I wanted to ask you,

4    this document is prepared and stored in the normal

5    course of your business and relates to your collection

6    activities.  Correct?

7        A.   Yes, sir.

8             MR. HOLCOMB:  All right.  We would move to

9    enter this as Exhibit 4.

10       Q.   Now, as promised, I'd like to go back to the

11   request for proposal --

12       A.   Okay.

13       Q.   -- which is Exhibit 2.

14       A.   Okay.

15       Q.   All right.  Now, on Page 8 -- oh, when did you

16   turn that data -- Exhibit 4, I'm sorry, that data

17   transfer, when did you turn that over to your attorneys?

18       A.   I do not recall.

19       Q.   All right.  Was it before two days ago?

20       A.   We produced -- of course, in this particular

21   case, as you're aware, we've had different counsel, and

22   this has been going on since 2013, so specific

23   documents, I would need some assistance from my counsel

24   to tell me when they received it.  I don't recall.

25       Q.   Okay.  So did you turn this over to David

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    action.

2         Q.   Did you take any -- did you rely on the court?

3    Did MSB rely on the court?

4         A.   Do we rely on the court for what?

5         Q.   In determining that the account was

6    collectible?

7         A.   Absolutely.

8         Q.   Did you take any additional steps to determine

9    that the account was collectible?

10        A.   We took all steps that we're required to under

11   contract.

12        Q.   All right.  You waited for Mr. Sailola to call

13   you back?

14        A.   For what?

15        Q.   For anything.

16        A.   He stated he was going to call us back.

17        Q.   Uh-huh.

18        A.   I don't know.

19        Q.   Did he?

20        A.   No, not him or his attorney.

21        Q.   Okay.  You continued to call while he was --

22   while you were waiting for him to call back?

23        A.   I'm sorry.  What?

24        Q.   Did you stop calling him?

25             MR. RIGBY:  Objection --

1      A.    We did stop calling him when the lawsuit was

2   filed.

3      Q.    Okay.  Did you stop calling him when he said he

4   would call you back?

5      A.    No.

6      Q.    All right.  I want to talk to you now more

7   about Exhibit 2.  I want to turn your attention --

8      A.    Is that the same exhibit we're on?

9      Q.    Yes, sir.  I want to turn your attention to

10   Section Four - Proposal Format and Content, on Page 17.

11      A.    When -- when it's a good time, I would like to

12   take a break to go to the restroom, when -- when it's

13   convenient.

14      Q.    Well, we're kind of at a --

15      A.    Whatever -- whatever is comfortable for you.

16      Q.    We're starting a new section, so we can do that

17   now --

18      A.    Okay.

19      Q.    -- if it would make you more comfortable.

20      A.    All right.

21            THE VIDEOGRAPHER:  Off the record.  1:53.

22            (Brief Recess)

23            THE VIDEOGRAPHER:  This is the beginning

24   of Tape 3.  Back on the record.  2:01.

25      Q.    We're back on the record, Mr. Million.  You're

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 8 of 74   PageID #:
2246

Aaron Million, Desig. Witness of
Municipal Services Bureau

184

1      A.   Not other than processing the placement file,

2   the referral file that was sent by the judiciary.

3      Q.   Okay.   You are familiar with eKokua?

4      A.   A court -- the court website?

5      Q.   Yes, sir.

6      A.   Yes.   Somewhat familiar.   I've used it before.

7      Q.   Well, in fact, in discovery you had -- or MSB

8   had disclosed a printout from --

9      A.   Uh-huh.

10      Q.   -- a calendar view of eKokua.

11      A.   Oh.   Yes, we did.

12           MR. HOLCOMB:   This will be, I guess,

13   Exhibit 8.

14           THE REPORTER:   Yes.

15      Q.   How did you obtain this document?

16      A.   From the court's website.   I believe you

17   referred to it as eKokua.

18      Q.   Uh-huh.

19      A.   Yes.

20      Q.   Who obtained this from eKokua?

21      A.   I don't know if it was -- I don't know.   I

22   don't remember who pulled this or if it was me.   It

23   could have been me.   I don't recall.

24      Q.   Okay.   How would you go about pulling this?

25      A.   You would go to the -- the URL for their

Aaron Million, Desig. Witness of
Municipal Services Bureau

1   websites and you would enter in the -- the case ID, I

2   believe, or the citation number, whatever information

3   you have available, and then it would retrieve the

4   record.

5       Q.   Okay.  Do you have to have any special

6   permission from the Hawaii State Judiciary to do this or

7   can anybody do it?

8       A.   You have to be in compliance with whatever

9   terms and conditions are on their site.

10      Q.   Okay.  So you have to check a box that says, I

11  will comply with these terms and conditions?

12      A.   I don't know if it's checking a box, but

13  there's some method of them presenting an acceptable use

14  or a terms and conditions, something --

15      Q.   Okay.

16      A.   -- to that effect.

17      Q.   And once a person says, yes, I will accept

18  these conditions, then they're allowed full access to

19  this.  Correct?

20      A.   I don't know if they're allowed full access to

21  everything or -- I mean, they have full access to what

22  we were able to retrieve here.

23      Q.   Okay.  All right.  Now, I wanted to take a look

24  here at the -- Page 42 is what it's Bates-stamped.

25      A.   Uh-huh.

Aaron Million, Desig. Witness of
Municipal Services Bureau

1     Q.   There's a January 7th entry.  Do you see that?

2     A.   I do.

3     Q.   What does that say?

4     A.   Order & Notice of Entry of Order.

5     Q.   No, sir.  Above it.

6     A.   Hearing Held.  LO, forward slash, I believe

7   that is --

8     Q.   You don't -- you don't have to read the names.

9   Just start "defendant not present."

10    A.   Defendant not present.  Jonathan

11  Burge-defending present.  Defense submitted request for

12  appeal, case pending perfection of appeal.  Bail

13  continued.

14    Q.   Okay.  Was January 7th before this account was

15  placed with MSB?

16    A.   Let's see.  According to these records, the

17  account was sent to collection agency on July 1st, 2013,

18  and so July 7th, 2013, is indeed before July 1st, 2013.

19    Q.   Okay.  And I want to direct your attention to

20  the entry dated June 6, 2013, on the same page, towards

21  the bottom.  Do you see that?

22    A.   Sure.  Yeah, and these are all entries that the

23  court entered, right, that we're looking at?  Yes.

24  Okay.

25    Q.   That's correct.

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

1       A.   Yes.

2       Q.   And, again, if you'll start reading where it

3   says "defendant not present."

4       A.   Defendant not present.  Bench warrant ordered.

5   Later, bench warrant recalled.  Notice of appeal filed

6   5-28-13.  Sentence stayed.  Bail continued.

7       Q.   Okay.  And June 6th was, in fact, before this

8   account was placed with MSB.  Is that correct?

9       A.   Uh-huh.  Yes.  Yes.  Sorry.  Yes.

10      Q.   All right.

11              MR. HOLCOMB:  I would like to enter that

12   as Exhibit 8.

13              Also, just for clarification, I want to

14   make sure that that contract was entered as Exhibit 7.

15   I don't recall having asked for that specifically.

16      A.   Oh, I have two of these.  Why do I have two of

17   these?

18              MR. RIGBY:  Just look at the one that has

19   the sticker on it.

20              THE WITNESS:  Okay.

21      Q.   Oh, I just gave you an extra copy.

22      A.   Oh, I see.  Okay.

23      Q.   All right.  We're -- we're done looking at

24   that.

25      A.   Oh, okay.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 12 of 74   PageID
#: 2250

Aaron Million, Desig. Witness of
Municipal Services Bureau

206

1      A.    Yeah.

2      Q.    I want to turn to Exhibit B.

3      A.    Which is?

4      Q.    It's not numbered, but it's after the last page

5  of her questions, which --

6      A.    The pages are numbered.  Oh.  Oh, you said it's

7  not numbered.

8      Q.    Yeah, it's not numbered.

9      A.    Okay.  What is -- well, I don't know what I'm

10  looking at.  I just --

11      Q.    Okay.

12      A.    Yeah.

13      Q.    Exhibit B.  It should be right after Page 4,

14  Mr. Million.  Here.  Sorry.  Let me show you.

15      A.    Is this entered into the -- because, I mean, if

16  it isn't here --

17      Q.    It should be.

18      A.    If it isn't in my copy -- is it -- is it this

19  one here?

20      Q.    Yes.  That's it.

21      A.    What's the exhibit on the bottom?  B?

22      Q.    Exhibit B.  Yeah.

23      A.    Okay.  Perfect.  Okay.

24      Q.    Okay.  Is that the subpoena that MSB caused to

25  be served on the Hawaii State Judiciary?

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 13 of 74   PageID
#: 2251

Aaron Million, Desig. Witness of
Municipal Services Bureau

207

1        A.   I just need to review it.  Mr. Minkin's

2    signature appears, so I think so.  Yes.

3        Q.   Okay.

4             MR. HOLCOMB:  We would like to introduce

5    this into evidence as Exhibit 9.

6        Q.   All right.  Now, let's look at the subpoena.

7    Do you see where the box is checked about halfway

8    through the page?

9        A.   Just to clarify -- oh, I'm sorry.  This is -- I

10   thought you were entering something else within here as

11   an exhibit.

12       Q.   Oh, no.

13       A.   Okay.

14       Q.   Do you see where -- about halfway through the

15   page there's an X in the box that starts "you are

16   commanded"?

17       A.   Yes.

18       Q.   Can you please read what that says, please?

19       A.   You are commanded to produce and permit

20   inspection and copying of the following documents or

21   objects described in Exhibit "1", attached hereto, at

22   the place, date, and time specified below.  It lists an

23   office for a court reporter and a date and time of

24   September 29, 2014, at 9:00 a.m.

25       Q.   Okay.  And can you turn -- it should be a

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    couple of pages -- to Exhibit "1"?

2       A.   Yes.

3       Q.   All right.  Now, will you -- well, what does

4    that page say?

5       A.   Documents to be Produced by Custodian of

6    Records, Hawaii State Judiciary, Office of the

7    Administrative Director of the Courts.

8            Please read this subpoena very carefully.

9    If you fail to bring with you documents called by this

10   subpoena that are in your possession, you may need to

11   return for a second deposition.

12           No. 1, Any and all documents, including

13   but not limited to filings, forms, letters, e-mails, and

14   contact sheets relating to contact information and/or

15   the collection of monies owed to the Hawaii State

16   Judiciary by the individual Reed Wade Sailola, whose

17   Party ID on the eCourt eKokua Judiciary Information

18   Management System is @18742 ("Sailola").

19           No. 2, Any and all documents, including

20   but not limited to filings, forms, letters, e-mails, and

21   contact sheets relating to the collection of monies owed

22   to the Hawaii State Judiciary by Sailola which contain

23   Sailola's contact information, including telephone

24   number, and which is the source of contact information

25   that was forwarded to Municipal Services Bureau with the

Aaron Million, Desig. Witness of
Municipal Services Bureau

212

1    1D-V-135, with a revision date.

2         Q.   Uh-huh.  But are they specific to Mr. Sailola?

3         A.   Oh, I -- I don't have that information.  I

4    don't know.

5         Q.   Okay.  Well, let's take a look.  Let's start

6    with the citation that has been attached that is

7    numbered 1DTI-12-021451.  Do you see that citation?

8         A.   I do.

9         Q.   Whose name is on that?

10        A.   Last name, Sailola; first name, Reed; middle

11   initial, W.

12        Q.   Do you see the right side, the right column, if

13   you will, where it starts -- the heading is Details

14   Regarding the Infraction(s) Charged.

15        A.   I do.

16        Q.   All right.  And what is the date, month, and

17   year listed there?

18        A.   March 9th, 2012.  9:15 a.m.

19        Q.   Okay.  And was MSB attempting to collect any

20   debt related to this citation?

21        A.   When?

22        Q.   Pertinent to this lawsuit.

23        A.   Not for this citation, no.

24        Q.   Okay.  Ever?

25        A.   Not to my knowledge.

Exhibit "K"

1     Q.   All right.  And then if you'll flip a couple

2  more pages over, Mr. Million, there is a second

3  citation, and it is numbered 1DTI-10-078113.  Do you see

4  that?

5     A.   I do.

6     Q.   Okay.  Whose name is listed as the defendant

7  there?

8     A.   Last name, Sailola; first name, Reed; middle

9  initial, W.

10    Q.   Okay.  And what date was that citation?  Again,

11 you'll look to the right -- right-hand column.

12    A.   June 2nd, 2010, at 12:04 p.m.

13    Q.   Okay.  Was MSB collecting any -- or was MSB's

14 collection efforts related to this citation?

15    A.   No.

16    Q.   Okay.  Has MSB ever attempted to collect any

17 money from this citation?

18    A.   Not to my knowledge.

19    Q.   Okay.  Two more pages, Mr. Million.  And we

20 have a citation numbered 1DTI-08-074883.  Do you see

21 that citation?

22    A.   Yes.

23    Q.   Who is the defendant listed there on that

24 citation?

25    A.   Last name, Sailola; first name, Reed; middle

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 17 of 74   PageID
#: 2255

Aaron Million, Desig. Witness of
Municipal Services Bureau

214

1    initial, W.

2        Q.    Okay.  And what's the date of that infraction?

3        A.    May 27th, 2008.  11:34 a.m.

4        Q.    Okay.  Was MSB attempting to collect any monies

5    resulting from that citation?

6        A.    Not to my knowledge.

7        Q.    Has MSB ever attempted to collect any money

8    related to this citation?

9        A.    Not to my knowledge.

10       Q.    Okay.  And then two pages over, we have a Bail

11   Bond Receipt, Acknowledgment, and Notice to Appear.  Do

12   you see that?

13       A.    I do.

14       Q.    Okay.  And what is the case number listed there

15   on the far right, 1DTA?

16       A.    Case number is 1DTA-11-03671.

17       Q.    Okay.  And is that the case that MSB was

18   attempting to collect?

19       A.    Yes, it appears to be.

20       Q.    Okay.  And the date of the arrest listed is

21   8-8-11?

22             MR. RIGBY:  I'm sorry.

23       Q.    Or at least the date -- I'm sorry.  The date on

24   this document says 8-8-11.  Do you see that?

25       A.    The date of the document is 8-8-11.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 18 of 74   PageID
#: 2256

Aaron Million, Desig. Witness of
Municipal Services Bureau

215

1       Q.    Okay.   What phone number is listed on this

2   document?

3       A.    There's a phone number 737-7563.

4       Q.    Okay.   Did MSB call that phone number?

5       A.    I don't know.   I would need to review records

6   that show what phone number we called, which should have

7   been produced to you.

8       Q.    Okay.   Are there any other phone numbers on

9   this document other than the 737 number?

10      A.    I do not see any other on this page.

11      Q.    Did Mr. Sailola provide any other numbers on

12  8-7 or 8-8-11?

13      A.    Oh, I don't know.

14      Q.    Okay.   Did MSB have Mr. Sailola's consent to

15  call as of 8-8-11?

16            MR. RIGBY:   Objection.   Calls for a legal

17  conclusion.

18      A.    Well, again, we would need to know what

19  consents, what call, and what number you're asking.

20      Q.    Okay.   Did they have -- did MSB have any

21  consent to call any number other than the 737 number

22  related to this specific account or case?

23            MR. RIGBY:   Objection to the extent it

24  calls for a legal conclusion.

25      A.    On what day?

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 19 of 74   PageID #: 2257

Aaron Million, Desig. Witness of
Municipal Services Bureau

217

1   speculation; legal conclusion.

2        A.   We would need to ask the judiciary.

3        Q.   Okay.  So you don't have any information

4   regarding how they obtained that phone number that they

5   sent to you?

6        A.   Again, we would need to ask the judiciary.

7        Q.   Does MSB have any information as to how the

8   Hawaii State Judiciary obtained the 864 number that MSB

9   called to collect this debt?

10       A.   I assume in the normal course of their

11   day-to-day operations.

12       Q.   Okay.  You assume that.  Do you have any

13   evidence to support your assumption?

14            MR. RIGBY:  Objection.  Calls for a legal

15   conclusion.

16       A.   The contract that states that we can rely on

17   the information provided to us by the judiciary.

18       Q.   Okay.  That amounts to consent --

19            MR. RIGBY:  Objection.  Calls for a legal

20   conclusion.

21       Q.   -- your contract with the judiciary?

22            MR. RIGBY:  Same objection.

23       Q.   Is that your testimony?

24            MR. RIGBY:  Same objection.

25       A.   Is what my testimony?

Aaron Million, Desig. Witness of
Municipal Services Bureau

```
 1                    MR. RIGBY:  Objection.  Asked and

 2     answered.

 3          A.   No.

 4          Q.   Does MSB have any information as to why?

 5                    MR. RIGBY:  Objection.  Calls for

 6     speculation.

 7          A.   Not that I'm aware of.

 8          Q.   All right.  Now, the last page that I want to

 9     discuss with you there is the Notice of Entry of

10     Judgment and/or --

11          A.   And, of course, Mr. Sailola confirmed his

12     consent when we spoke with him.

13          Q.   Well, we'll get into that in a minute.

14          A.   Okay.

15          Q.   That was after you had already started calling.

16     Correct?

17          A.   We had consent when we started calling, but

18     then he confirmed it when we spoke with him.

19          Q.   All right.  Well, we'll talk about that in a

20     minute, Mr. Million.  But --

21          A.   Sure.

22          Q.   Look at the last page there that they produced.

23     Have you got that, the judgment?  Notice of Entry of

24     Judgment.

25          A.   Yes.
```

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 21 of 74   PageID #: 2259

Aaron Million, Desig. Witness of
Municipal Services Bureau

221

1      Q.   Okay.  Now, is that the case that you were

2  collecting?

3      A.   I'll need to review it.  It appears to be the

4  same case number.

5      Q.   Okay.  Now, look at the bottom left corner

6  where it says -- it's got a big circle and it says

7  "apply."  Do you see that?

8      A.   Yes, I do.  Uh-huh.

9      Q.   All right.  And it says $1,000, Bail Bond

10  Posted.  Do you see that?

11      A.   Uh-huh.

12      Q.   Okay.  Oh, yeah.  Could you not -- not say

13  uh-huh?

14      A.   I apologize.  Yes, I do see it.

15      Q.   Okay.  All right.  Now, are there any phone

16  numbers on this document?

17      A.   I'll -- I'll review it here.  I don't see it,

18  no.

19      Q.   Okay.

20      A.   I don't see any other phone number.

21      Q.   All right.  What date is this -- or what is the

22  date of this document?

23      A.   The date of the document is December 6, 2012.

24      Q.   Okay.  Now, where it says -- where I showed you

25  at the circle, what does "apply" mean there?

Case 1:13-cv-00544-HG-RLP  Document 112-13  Filed 12/19/14  Page 22 of 74    PageID #: 2260

Aaron Million, Desig. Witness of
Municipal Services Bureau

222

1        MR. RIGBY:  Objection.  Calls for a legal

2   conclusion.

3        A.   I don't know.  I don't know whose notes those

4   are or what that -- I don't know what -- in what context

5   that refers.

6        Q.   Well, you've found out since, haven't you?  MSB

7   has found out since?

8        A.   Perhaps you can refresh my memory.

9        Q.   Well, didn't Megan Allen receive information

10  from the Hawaii judiciary that says the bond should have

11  been applied?

12       A.   Yeah, I don't recall if that communication said

13  that $1,000 bail would be applied, but --

14       Q.   Okay.  When is the first time MSB saw this

15  judgment form?

16       A.   I believe with the subpoena.

17       Q.   Okay.  There was no investigation done to

18  obtain this judgment form by MSB other than this

19  subpoena?

20       A.   Sure.  That investigation was -- that was the

21  first opportunity to conduct an investigation, and so

22  this is the product of that investigation.

23       Q.   Was this bail bond related to Hawaii law?

24            MR. RIGBY:  Objection.  Calls for

25  speculation; legal conclusion.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 23 of 74   PageID #: 2261

Aaron Million, Desig. Witness of
Municipal Services Bureau

233

1    Q.   Well, I'm just asking you.  Does it?

2    A.   I would need to review it again.

3    Q.   All right.  Well, take a look.

4    A.   What's the exhibit number?

5              MR. RIGBY:  4.

6    Q.   4.

7    A.   No, this sheet does not include the -- the fee

8    that's outlined in the fee schedule.

9    Q.   Okay.

10             MR. HOLCOMB:  I would like to,

11   incidentally, enter as Exhibit 10 that consumer fact

12   sheet that we just went over.

13   Q.   All right.  Now, looking at this consumer fact

14   sheet, my question was, is $1,000 more than the amount

15   of money that MSB sought to collect from Mr. Sailola?

16   A.   Yes, it is.

17   Q.   So why were you collecting from Mr. Sailola?

18   A.   Because the account was referred by our client.

19   Q.   Okay.

20   A.   And, of course, we don't know if the highest

21   balance that he's ever had was the amount that was

22   referred.  He could have made payments before it was

23   referred to collection.

24   Q.   So he could have made payments on whatever

25   amount that he --

1       A.   Whatever amount he owed.

2       Q.   Okay.  Well, let me show you again the last

3   page of the written interrogatory subpoena duces tecum.

4   I believe that was Exhibit 9.

5       A.   Oh, I had it here.  Yes.  Okay.

6       Q.   Do you see this judgment form, the last page

7   there?

8       A.   I do.

9       Q.   And what amounts are listed there?

10      A.   Well, are all of these amounts intended to be

11  added or is there anything subtracted?  I don't know

12  what all these fields are for.

13      Q.   Well, if you add them all up, is it less than

14  $1,000?

15      A.   Let's see.  It appears to be, yes.  Uh-huh.

16      Q.   So why were you collecting from Mr. Sailola?

17           MR. RIGBY:  Objection.  Asked and

18  answered.

19      A.   Well, I don't know if this is the only sheet

20  that's used to calculate the total amount of fees that

21  is ultimately due from a defendant who's -- who has a

22  fine that they owe.

23      Q.   So the Hawaii State Judiciary was not

24  responsive to your subpoena duces tecum?  Is that your

25  testimony?

Aaron Million, Desig. Witness of
Municipal Services Bureau

235

1    A.    Oh, no.  I didn't say that.

2    Q.    Okay.  So you would agree that the Hawaii State

3  Judiciary has produced all of the documents that are

4  responsive to the subpoena duces tecum?

5    A.    I am sure that they complied with --

6    Q.    Okay.

7    A.    -- the subpoena.

8    Q.    And if there are no other documents produced,

9  then is it safe to say that those documents don't exist?

10    A.    Well, I don't know if that's a safe assumption.

11  I don't know if these are calculated on something that

12  isn't in a document or I don't know why the placement

13  file that we received at MSB wasn't produced.  I don't

14  know.  I don't have the answer to that question.

15    Q.    Did a debt exist on December 6, 2012?

16    A.    I'm sorry?  Did a --

17    Q.    Did the debt exist on December 6, 2012?

18          MR. RIGBY:  Objection.  Calls for a legal

19  conclusion.

20    A.    Well, it wasn't referred for collection as of

21  that date, so I don't know in what context it exists or

22  doesn't prior to it coming to MSB.

23    Q.    Did MSB have consent to call Mr. Sailola using

24  an automated telephone dialing system --

25          MR. RIGBY:  Objection.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 26 of 74   PageID #: 2264

Aaron Milich, Desig. Witness of
Municipal Services Bureau

241

1    864 -- that begins with 864 that MSB called is not on

2    either of those documents, is it?

3         A.    Either of which documents?

4         Q.    The two documents that were produced to you

5    related to 1DTA-11-03671, which would be the bail bond

6    receipt and the judgment form.

7         A.    I would agree, but the number certainly is

8    included in other documents provided by the judiciary.

9         Q.    What documents?

10        A.    Other documents in Exhibit 9.

11        Q.    Okay.  Are those transactions -- are those

12   documents in Exhibit 9 related to the account for which

13   you were going to -- or for which MSB was collecting

14   against Mr. Sailola?

15        A.    I'm not sure how the court evaluates their

16   relationship.

17        Q.    Okay.  How do you evaluate?

18        A.    I don't.

19        Q.    All right.  Do you know what consent is?

20        A.    I do.

21        Q.    What is it?

22             MR. RIGBY:  Calls for a legal conclusion.

23        A.    In a simple term, permission.

24        Q.    Okay.  How might that permission be --

25        A.    Although I'm not in any way suggesting that we

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

255

1    Q.    Okay.

2    A.    Yeah.

3    Q.    I want to ask you about this Notice of Entry of

4    Judgment in particular.  Could MSB have obtained that

5    before this subpoena duces tecum was issued?

6    A.    It had no purpose to, but, yes, it could have.

7    Q.    Should it have obtained it before?

8              MR. RIGBY:  Calls for speculation.

9    A.    No, not in my opinion.

10   Q.    Was it reckless not to obtain it before issuing

11   the subpoena duces tecum?

12             MR. RIGBY:  Objection.  Calls for a legal

13   conclusion.

14   A.    No.

15   Q.    Why?

16             MR. RIGBY:  Same objection.

17   A.    Well, as soon as we knew that there was a

18   dispute, which was the lawsuit, the account was

19   immediately placed on hold, so there was no additional

20   collection activity that could have occurred or that did

21   actually occur and we went through the normal legal

22   lawsuit process.  Perhaps it could have even happened

23   quicker had Mr. Sailola ever contacted us or his

24   attorney to just ask us to investigate it.

25   Q.    After the phone call with Michael Dorn --

Exhibit "K"

1    Q.   What is this, Mr. Million?

2    A.   This is an e-mail, a printed e-mail.

3    Q.   Okay.  From whom?

4    A.   From A. Lee Rigby to Judy Tanaka, Glenn

5  Melchinger, and Aaron Million --

6    Q.   Okay.

7    A.   -- copying somebody by the name of K. Guadagno

8  and Heather Newby.

9    Q.   All right.  And what e-mail -- is there another

10  e-mail shown on this document?

11    A.   Yes.

12    Q.   Okay.  From whom and to whom?

13    A.   From Megan Allen to Aaron Million and A. Lee

14  Rigby.

15    Q.   Okay.  What's the date that e-mail was sent?

16    A.   November 18, 2014.

17    Q.   Okay.  Are there -- is there yet another e-mail

18  below that one that is evidenced on this document?

19    A.   Uh-huh.

20    Q.   What -- who is that from and to -- or who is

21  that e-mail between and what's the date on that?

22    A.   Jeanne Taketa to Megan Allen.

23    Q.   Okay.  What's that date?

24    A.   September 2.

25    Q.   2000 --

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    A.    '14.

2    Q.    Okay.  And what does that e-mail state?

3    A.    Hi, Megan!  There is a mistake on this case.

4  Again, this is the e-mail from the -- from the Hawaii

5  judiciary.  Hi, Megan!  This is a -- there is a mistake

6  on this case.  The bail that was posted should have

7  covered the fines and fees on this case.  This means

8  that the case should not be at collections.  I expect

9  that staff will remedy this situation by cancelling this

10  case from collections shortly.  Thanks.  jmt.

11    Q.    Who is Megan Allen?

12    A.    Megan Allen is our director of client services.

13    Q.    Okay.  Now, it also shows on this document that

14  Ms. Taketa was responding to an e-mail from Megan Allen.

15  Is that true?  Or Megan Allen.  Is that true?

16    A.    Yes.  Yes.  Yes.

17    Q.    All right.  When did Ms. Allen send the e-mail

18  to Ms. Taketa?

19    A.    September 2nd at 6:33 a.m.

20    Q.    Okay.  And what did she send to Ms. Taketa?  I

21  mean, what was the text of her e-mail?  I'm sorry.

22    A.    She said, Hi, Jeanne.  I believe that's how the

23  name is pronounced.  Sorry we missed each other last

24  Friday!  I hope you had a wonderful Labor Day weekend.

25  Smiley face.  I will give you a call later today and

Exhibit "K"

Arbon Minkin - Designated Witness of
Municipal Services Bureau

1    hopefully we can connect and discuss some additional

2    information we need on a debtor placed with us.  And

3    there's case number 1DTA-11-03671; placed 7-2-2013;

4    phone number 808-864-4957.  Can you confirm how you

5    received the phone number (debtor citation, etc.)?  Are

6    you also able to provide a copy of the actual citation?

7    Thanks for your help!  Hopefully we can connect later

8    today and I can give you more details on why this is

9    needed.  Regards, Megan Allen.

10        Q.   Okay.  She says she will give Ms. Taketa a call

11   later that day.  Do you know if that phone call ever

12   occurred?

13        A.   Oh, I don't know.

14        Q.   Do you know any further discussions that MSB

15   has had with the Hawaii State Judiciary regarding this

16   account?

17        A.   I'm not aware of any.

18        Q.   All right.  Do you know whether the Hawaii

19   State Judiciary confirmed how they received the phone

20   number?

21        A.   I do not know.

22        Q.   Do you know whether they were able to produce a

23   copy of any actual citation related to this account

24   other than what was produced in response to the subpoena

25   duces tecum?

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    conclusion.

2        Q.   Did MSB willfully wait until September 2nd,

3    2014, to inquire with the Hawaii State Judiciary?

4                MR. RIGBY:  Objection.  Calls for a legal

5    conclusion.

6        A.   I can't speak to the willfulness of any

7    particular individual.

8        Q.   Did the debt exist, according to Ms. Taketa?

9                MR. RIGBY:  Objection.  Calls for

10   speculation.

11       A.   Did the debt exist?

12       Q.   Uh-huh.

13       A.   Well, I think it's clear the debt existed.

14   Yeah.

15       Q.   Why?

16       A.   Because she indicates that bail was used to

17   cover the debt, the filing fees.

18       Q.   Okay.

19       A.   So it did exist.

20       Q.   She said that the bail that was posted should

21   have covered the fines and fees on this case?

22       A.   Uh-huh.

23       Q.   And you believe that to be true?

24                MR. RIGBY:  Objection.  Calls for

25   speculation.

Exhibit "K"

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 32 of 74    PageID #: 2270

Aaron Minion, Desig. Witness of
Municipal Services Bureau

265

1      A.   I have no -- I have no reason to question the

2   court.

3      Q.   And the information that we have is that the

4   court had the bail in its possession?

5      A.   Based on this communication.

6      Q.   Ms. Allen also says in this e-mail that she was

7   going to tell Ms. Taketa why this information was

8   needed.

9      A.   Uh-huh.  Yeah, I can see that down there.

10     Q.   Did she ever tell anyone at the Hawaii State

11  Judiciary why details on this account were needed?

12     A.   I don't know.

13     Q.   Did anyone from MSB ever tell Hawaii State

14  Judiciary why more details on this account was needed?

15     A.   I -- no, I don't know.  I can't speak to that.

16     Q.   All right.

17          MR. HOLCOMB:  And we are going to lodge a

18  formal objection pursuant to Rules 26, 34, and 30 that

19  we weren't informed of Ms. Allen's participation in this

20  case prior to November 18th, 2014, and we demand that

21  she be produced to be questioned as well.

22          I'd like to enter that e-mail as the

23  exhibit next in order, please.

24          All right.  Now, I have some copies here

25  of some certified Notice of Entries of Judgment.  And I

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 33 of 74   PageID #: 2271

Aaron Million, Desig. Witness of
Municipal Services Bureau

267

1     A.   I don't recall seeing these.

2     Q.   Okay.

3     A.   But like I said, they -- they look very similar

4  to this one here.

5     Q.   Does -- do these documents pertain to the case

6  that you were collecting, based on the case number?

7              MR. RIGBY:   Objection.   Calls for

8  speculation.

9     A.   Case number is the same.

10     Q.   Okay.   Now, the first one -- I think the first

11  one that I stapled there is dated January 7th, 2013?

12     A.   Yes.

13     Q.   See that?   And what does it say in the

14  Conditions box or Conditions portion of this form?

15     A.   Could you --

16     Q.   The handwritten --

17     A.   -- please point me to the area.

18     Q.   The handwritten portion.

19     A.   Conditions.   Sentence, perfection of appeal

20  (transcript requested and exhibits needed for appeal).

21     Q.   Okay.   And who is the attorney listed down at

22  the bottom?

23     A.   Jonathan Burge.

24     Q.   Okay.   And immediately above that, do you see

25  where it says bail bond posted, 1,000?

Aaron Million, Desig. Witness of
Municipal Services Bureau

268

```
 1              MR. RIGBY:   Just above the attorney's

 2    name.

 3         Q.   Immediately above Mr. Burge's name.

 4         A.   Yes.

 5         Q.   Okay.  And what does that say?  It's circled

 6    and what does that word say?

 7         A.   $1,000 continued.

 8         Q.   Okay.  Now, if you'll turn to the next one,

 9    Mr. Million.

10         A.   Uh-huh.

11         Q.   Does this have the same case number?

12         A.   Yes.

13         Q.   Okay.  What's the date of this, this form?

14         A.   Thursday, June 6, 2013.

15         Q.   Okay.  Now, in the Conditions portion of that,

16    what does it say?

17         A.   I'm not sure what that first letter is.  Is

18    that a D?  DAF?  I don't know.

19         Q.   Okay.

20         A.   File not provided by -- I don't know what

21    that's -- pros.

22         Q.   Okay.

23         A.   Sentence stayed pending appeal (notice filed

24    5-28-13).  And something that's not legible to me

25    beneath it.
```

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 35 of 74   PageID
#: 2273

Aaron Million, Desig. Witness of
Municipal Services Bureau

269

1       Q.   Okay.  And you'll see down where the bail bond

2   is posted.  Do you see that in the same place, $1,000

3   that's circled?

4       A.   Yes.

5       Q.   And what does that say?

6       A.   I'll spell it.  I don't think it's a word.

7       Q.   Okay.

8       A.   C-o-n-t.

9       Q.   All right.  Okay.  Was Mr. Sailola's request to

10  have his sentence stayed on January 7th, 2013, express

11  consent to receive collection calls?

12              MR. RIGBY:  Objection.  Calls for a legal

13  conclusion.

14      A.   I need you to ask that question a little

15  slower.  I didn't catch all that.

16      Q.   Was Mr. Sailola's request to have his sentence

17  stayed on January 7th, 2013, express consent to receive

18  collection calls?

19              MR. RIGBY:  Same objection.

20      A.   I think those two items are not related in any

21  way.

22      Q.   Might that request indicate that Mr. Sailola

23  did not consent to receive collection calls pertaining

24  to this case?

25              MR. RIGBY:  Calls for a legal conclusion.

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    calls.

2         Q.   Okay.  Is all -- are all the calls that were

3    placed by MSB to Mr. Sailola on this document?

4         A.   I may -- I may need to correct that statement

5    now that I'm reviewing this here.  The -- the telephone

6    residence are probably still going to be calls used

7    through -- or made through the i3 telephone software.

8    They just happen to be the instances where like the

9    agent left a message on the machine.  So I want to

10   clarify that.

11        Q.   Thank you for clarifying.

12        A.   Yeah.  Absolutely.

13        Q.   Are all the calls that were placed by MSB to

14   Mr. Sailola on this document?

15        A.   Yes.

16        Q.   Now, many of these on the user name field, they

17   say "dialer," while several of them say someone's name.

18   Why is that?

19        A.   Yeah.  So the -- the instances where you see

20   the individual's name, what that's telling you is that

21   they physically typed in the notes that you see on

22   this --

23        Q.   Okay.

24        A.   -- on this report, and you'll see that those

25   correspond with the recorded messages.  In the case of

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 37 of 74   PageID #: 2275

Aaron Million, Desig. Witness of
Municipal Services Bureau

311

1      Q.   All right.  So for the calls where a person's

2   name appears, were the numbers dialed any differently

3   than the calls that just say "dialer"?

4      A.   No, not necessarily.

5      Q.   Who is CS Systems?

6      A.   I would need you to point me to where you see

7   that.

8      Q.   I'm sorry.  CR -- CR --

9      A.   CR Software?

10     Q.   -- Software.

11     A.   CR Software is the manufacturer of the

12   collection system.

13     Q.   Okay.

14     A.   Just a note for you, CR Software was acquired

15   by FICO --

16     Q.   Uh-huh.

17     A.   -- so it's now FICO.

18     Q.   All right.  So what is CR Software's role in

19   all this?

20     A.   They manufactured the software that we use.

21     Q.   All right.  Well, let's talk about your dialing

22   system.  How does it work?

23              MR. HOLCOMB:  Oh, I hope that I moved to

24   have this admitted.  If I did not, I'm doing so now, the

25   Consumer Fact Sheet, Exhibit 10.

Exhibit "K"

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 38 of 74   PageID
#: 2276

Aaron Million, Desig. Witness of
Municipal Services Bureau

312

1    Q.   How does your dialing system work?

2              MR. RIGBY:  Objection.  Calls for a

3    narrative; vague and ambiguous.

4    A.   We would need to drill down a little more

5    specific than that.  There's, as you know, about 900

6    pages of what -- how it does things.

7    Q.   Okay.  Does a human dial the phone number?

8    A.   Yes, it can.

9    Q.   In any of those calls on Exhibit 10, did a

10   human dial the phone number?

11   A.   A human told the dialer which number to call.

12   Q.   Okay.  Are you claiming that your system is not

13   an automatic telephone dialing system because it does

14   not store numbers?

15             MR. RIGBY:  Objection.  Calls for a legal

16   conclusion.

17   A.   I'm not a lawyer, so I can't make that

18   statement, but I can tell you that we know that our

19   dialer does not meet the full and complete definition of

20   an ATDS as indicated under the TCPA.

21   Q.   Is it a predictive dialer?

22             MR. RIGBY:  Objection.  Calls for a legal

23   conclusion.

24   A.   There are predictive capabilities.

25   Q.   It has the capacity to store numbers?

Exhibit "K"

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 39 of 74   PageID #: 2277

Aaron Minton, Desig. Witness of
Municipal Services Bureau

313

1            MR. RIGBY:  Objection.  Calls for a legal

2      conclusion.

3         A.    Not numbers which have been randomly

4      generated --

5         Q.    All right.

6         A.    -- or produced.

7         Q.    But it has the capacity to store numbers that

8      are transferred into your system?

9         A.    It has the capacity to call the numbers that we

10     tell it to call.

11        Q.    Okay.  MSB loads those numbers into the dialer?

12        A.    A person prepares a list of numbers to be

13     called.

14        Q.    Okay.  What person?

15        A.    Whoever is responsible for managing that

16     function.

17        Q.    Who's responsible for managing that function?

18        A.    That would vary based on who's responsible for

19     that particular function that day or --

20        Q.    Okay.

21             MR. HOLCOMB:  Oh, yeah, I just want to

22     also make sure that we object pursuant to Rules 26, 34,

23     and 30 that Randy Holdridge has not been -- we've never

24     heard of them before.  We want them produced as a

25     deponent as well.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 40 of 74    PageID
#: 2278

Aaron Million, Desig. Witness of
Municipal Services Bureau

314

1        Q.    All right.   So who produced the number to be

2    dialed for Mr. Sailola's campaign?

3        A.    Oh, I don't know.

4        Q.    Can you find that out?

5        A.    I do not know how I would do that.

6        Q.    Okay.   How do they produce the numbers to be

7    dialed in a campaign?

8        A.    Well, of course, the phone system is completely

9    separate and distinct from the collection system, so

10   those two things are not integrated, but the -- a list

11   can be prepared through querying information from the

12   collection system.   The person organizes it and then,

13   you know, commands the person that launches the

14   telephone call.

15       Q.    How many IT people put the numbers into the

16   dialer?

17       A.    I do not know how many.

18       Q.    Do they have a user ID?

19       A.    Well, everybody who has -- well, sure.   I mean,

20   a user ID of some sort.

21       Q.    Does the -- do the collectors select which

22   number to be dialed?

23       A.    They may.

24       Q.    Did they in any of these calls that were made

25   to Mr. Sailola?

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

```
 1        A.    I do not know.

 2        Q.    Okay.   When it says "dialer" and no collector

 3   is connected to a call, did a collector decide to call

 4   Mr. Sailola's number?

 5        A.    To the extent that the person who created it --

 6   these calling lists is considered a collector,

 7   potentially, yes.

 8        Q.    Okay.   So when they create these calling lists,

 9   they basically create what's called a campaign, pursuant

10   to your manuals.   Correct?

11        A.    That's correct.

12        Q.    All right.   How often do they do that?

13        A.    That's done on a daily basis.

14        Q.    And then the dialer decides when to call

15   certain numbers from that campaign list.   Is that true?

16        A.    No.   That's not true.

17        Q.    All right.   What -- tell me how that works.

18        A.    To my understanding, the list is prepared and

19   there's -- there's no particular -- how do I phrase

20   this?   Of course, I'm not an IT professional or an

21   expert.   But the list is prepared and the list is going

22   to be called in the order that it was prepared.

23        Q.    What must a caller do to have the number

24   dialed?

25        A.    I'm sorry?
```

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

317

1    A.   Well, keep in mind that that term "dialer" is

2    used for other functions, too, like mailing letters and

3    so on, which is not anything to do with making phone

4    calls.  So, yeah, I don't know what -- how to answer

5    that question the way it's phrased.

6    Q.   Did a human punch in ten numbers when it says

7    "dialer" on that list?

8    A.   No.

9    Q.   All right.  Must a human instruct the dialer to

10   call a certain number?

11   A.   Yes.

12   Q.   When?

13   A.   When the campaign is created.

14   Q.   Okay.  But after the campaign is created, they

15   don't -- a human doesn't have to instruct the dialer

16   before the number is called.  Is that true?

17                  MR. RIGBY:  Objection.  Misstates prior

18   testimony.

19   A.   That's -- the way that's phrased is not true.

20   When a call is placed, the collector instructs the

21   telephone software to call the next number.

22   Q.   To call the next number?

23   A.   Uh-huh.

24   Q.   Does it -- does the collector select which

25   number will be the next number?

1      A.   To the extent that the command they hit in

2   their computer system performs that function, yes.

3      Q.   All right.  So does it get to -- does a

4   collector see a list of numbers and select which one to

5   call or do they just select "next" and the dialer calls

6   the next number?

7      A.   They may.  If they're looking at different

8   accounts, they may type in the ten digits and call the

9   number.

10      Q.   Did they do that in Mr. Sailola's case?

11      A.   I don't know.

12      Q.   All right.  But it has the capacity to just

13   call the next number?

14           MR. RIGBY:  Objection.  Calls for a legal

15   conclusion.

16      A.   The -- well, certainly.  As soon as -- as soon

17   as we tell it to call the next number, it calls the next

18   number.

19      Q.   It predicts the best times to call each number?

20           MR. RIGBY:  Objection.  Misstates prior

21   testimony.

22      A.   I don't believe it predicts the best time to

23   call anybody, no.

24      Q.   It chooses the speed at which to place the

25   calls?

Aaron Million, Desig. Witness of
Municipal Services Bureau

319

1    A.   It has algorithms to determine, yeah, how

2  quickly to place a -- to place a phone call, yes.

3    Q.   Well, doesn't it also -- when you said it

4  doesn't predict the best times to call, doesn't it

5  select which time zone should be called at certain

6  times?

7    A.   It does not select which time zones.  It

8  prohibits time zones that are excluded.  That's a

9  safeguard that we have in place to protect consumers.

10    Q.   Okay.

11    A.   But we run -- we can -- we may run multiple

12  campaigns in a day to help determine which order we want

13  to call accounts and whether we want to call the east

14  coast or central time or whatever.

15    Q.   All right.  Is there a manual for your dialer?

16    A.   Yes.  We produced it to you.

17    Q.   Okay.  So that 850-page document is the manual

18  for your dialer?

19    A.   At least a portion of it is.  It may also be --

20  it may cover other systems relative to the i3 telephone

21  software.

22    Q.   Okay.  Are the -- well, excuse me.  Does the

23  manual that you provided to us accurately describe your

24  dialer and its functions?

25    A.   To the extent that we use certain features, you

Exhibit "K"

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 45 of 74   PageID #: 2283

Aaron Minkin, Desg. Witness of Municipal Services Bureau

320

1    know, that manual is probably -- it may include

2    functions or features or software packages that we don't

3    use or never purchased.

4        Q.   Okay.  Do you have two separate dialing

5    systems?

6        A.   No.  Everything is i3.

7        Q.   Did an outside company make any of these calls?

8        A.   No.

9        Q.   All right.  Are you currently using the

10   Platinum or Titanium version of the CR Software?

11       A.   We -- well, in our -- in the courts -- for MSB

12   court debt, we use CRS Titanium.

13       Q.   Okay.  How -- how are Platinum and Titanium

14   different?

15       A.   They're just -- they're different -- I'm not an

16   IT expert, so it's -- you know, please forgive me there,

17   but they're different types of systems.  Titanium is a

18   newer version; Platinum is an older version.  Yeah.

19       Q.   When did MSB change to those versions?

20       A.   I believe we upgraded in 2010 or '11.  2011,

21   maybe.  Yeah.

22       Q.   Okay.  Was the i3 interactive dialer used for

23   the Platinum -- with the Platinum version?

24       A.   That predates my time at the company, so I do

25   not know.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 46 of 74   PageID #: 2284

Aaron Millich, Desig. Witness of
Municipal Services Bureau

323

1      Q.   The e-mail that you referred to in Exhibit

2    12 -- I mean, Paragraph 12.   Correct?

3      A.   Yes.

4      Q.   All right.

5            MR. HOLCOMB:   I would like this to be

6    admitted as Exhibit 15 at this time.

7      Q.   All right.   Now, I want to show you the e-mail

8    that was filed as Docket No. 5910 in this case.

9      A.   Uh-huh.

10           MR. HOLCOMB:   And I would like that marked

11   as Exhibit 16, please.

12     Q.   Okay.   Is this the e-mail that you referred to

13   as Exhibit "1" in your declaration we just read, sir?

14     A.   Yes, it is.

15     Q.   Okay.   And who is Javier Garcia?

16     A.   He's one of our IT personnel.

17     Q.   Okay.   Now, what date -- well, who is Michael

18   Toppeta?

19     A.   He appears to be an employee of AVDS.

20     Q.   Okay.   The e-mail to Javier from Michael

21   Toppeta is what you were referring to as Exhibit "1" in

22   your declaration.   True?

23     A.   Yes.   Uh-huh.

24     Q.   What is the date of that e-mail, sir?

25     A.   October 28th, 2013.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 47 of 74   PageID
#: 2285

Aaron Million, Desig. Witness of
Municipal Services Bureau

324

1     Q.   Okay.  And in there -- in that e-mail,

2   Mr. Toppeta says that store -- Javier, store or produce

3   telephone numbers to be called, using a random or

4   sequential number generator dialer can store numbers you

5   load to be dialed, but cannot produce numbers to be

6   dialed, randomly or sequentially.  Is that true?

7     A.   Correct.

8     Q.   And it dials -- the dialer then dials out from

9   the lists that are loaded for it to dial.  Is that true?

10    A.   It is.

11    Q.   That accurately describes how this dialer

12  works?

13    A.   I believe so.

14    Q.   Okay.  Now, I'm wondering why in your

15  declaration that you said that MSB relied on this

16  e-mail, in part, to make the decision to purchase the

17  system when you had also testified that it was purchased

18  before you even were employed there in 2011.

19    A.   Sure.  Well, I don't think my statement says

20  anything about purchasing the dialer.  What it says is

21  "in reaching a decision to use the Interactive

22  Intelligence system."  And so what happens was, we

23  decided on -- on or around Monday, October 28th, 2013,

24  to obtain an opinion from AVDS, and based on that, that,

25  in part, helped us decide to continue using the

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 48 of 74   PageID
#: 2286

Aaron Million, Desig. Witness of
Municipal Services Bureau

327

1          MR. RIGBY:  He's going to hand you a

2   document.  Wait for the sticker to be put on it.

3          THE WITNESS:  Well, if he's handing me

4   something, I'm going to --

5          MR. HOLCOMB:  I'm sorry.  I'll hand it to

6   the court reporter first.

7          MR. RIGBY:  There's a process here.

8          THE WITNESS:  Well, I -- if the lawyers

9   delete it, then I'm --

10      Q.   Okay.  Now, what I have handed you says

11   Chapter 2, Dialer and Database Architecture.  Is that

12   true?

13      A.   Yes.

14      Q.   It's Bates-stamped MSB000182?

15      A.   Yes.

16      Q.   Is this part of the manual that you referred to

17   earlier dealing with your -- the i3 dialer?

18      A.   It appears to be, but if I could see the index

19   I could confirm it.

20      Q.   Okay.  Do you have any reason to doubt the

21   authenticity of this document?

22      A.   No particular reason.

23      Q.   All right.

24          MR. HOLCOMB:  Mr. Rigby, are you going to

25   stipulate to the authenticity of this document in light

Case 1:13-cv-00544-HG-RLP  Document 112-13  Filed 12/19/14  Page 49 of 74  PageID #: 2287

Aaron Million, Desig. Witness of
Municipal Services Bureau

328

1    of the fact that we were produced 850 pages of this

2    document a day ago and had to --

3         MR. RIGBY:  Sure.  It's got our Bates

4    number on there.

5         MR. HOLCOMB:  Okay.  All right.

6    Q.   Now, I want to turn your attention to Bates

7    stamp Page 185.

8    A.   Okay.

9    Q.   All right.  The first sentence there says,

10   Interaction Dialer is a set of client/server extensions

11   that add predictive dialing and campaign management

12   capabilities to the Consumer Interaction Center

13   platform.  Is that a true statement?

14   A.   It's the statement that exists here.

15   Q.   Is that a true statement?

16   A.   Again, this isn't my -- my software.  I -- I

17   have to assume it's true, but, again, it's not -- you

18   know, I didn't write the code of the software.

19   Q.   Are you not using the Interaction Dialer?

20   A.   We are.  Yes.

21   Q.   Okay.  So when it says Interaction Dialer™,

22   it's referring to your -- MSB's dialer that it's using

23   currently.  Correct?

24   A.   Well, especially since it's a trademark, it's

25   actually referring to Interactive Intelligence's dialer,

Aaron Million, Desig. Witness of
Municipal Services Bureau

329

1    but we -- MSB uses Interactive Intelligence Interaction

2    Dialer.

3        Q.    Okay.  But the name of the product that you use

4    is Interaction Dialer?

5        A.    Yes.  That's correct.

6        Q.    Okay.  All right.  And you rely on the

7    manufacturer when it tells you that that particular

8    product adds predictive dialing and campaign management

9    capabilities to the system?

10       A.    Yes.

11       Q.    All right.  Will you please turn to Bates stamp

12   Page 186.  And do you see the first bullet point there?

13       A.    I do see it.

14       Q.    And the first sentence of that says, The

15   outbound dialer server uses its predictive algorithm to

16   provide intelligent outbound predictions.

17       A.    Uh-huh.

18       Q.    Is that true?

19       A.    Yes.  I had previously mentioned that.

20       Q.    Okay.  Please turn to Bates stamp Page 189.

21       A.    I'm there.

22       Q.    Okay.  Do you see the -- under Interaction

23   Administrator, the second paragraph, it says,

24   Interaction Dialer adds the capability to manage and

25   configure zones, stages, rules, schedules, campaigns,

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 51 of 74   PageID
#: 2289

Aaron Million, Desig. Witness of
Municipal Services Bureau

330

1    and workflows.

2        A.    Uh-huh.

3        Q.    Is that true?

4        A.    It is true for the Interaction Administrator,

5    which is not the Interaction Dialer.

6        Q.    Well, doesn't it say the Interaction Dialer

7    adds the capability to manage and configure?

8        A.    Yeah, to understand the context, I would need

9    to read a little bit of the -- this part of the chapter.

10       Q.    Is that what this book -- I mean, this manual

11   that you've produced here says?

12       A.    It does.  But as you -- as you'll notice, it's

13   also under a bold header that says Interaction

14   Administrator.

15       Q.    Okay.  Is your testimony that the Interaction

16   Dialer does not have the capacity to add capability to

17   manage and configure zones, stage -- stages, rules,

18   schedules, campaigns, and workflows?

19       A.    My testimony is that I would need to learn more

20   about the dependencies that enable that capability.

21       Q.    Okay.  Page 190.

22       A.    Yes.

23       Q.    All right.  Do you see where it says Automated

24   Dialing as the subheading?

25       A.    I do.

Aaron Million, Desig. Witness of
Municipal Services Bureau

331

1     Q.    And it says that the Interaction Dialer

2     retrieves telephone numbers from a call queue?

3     A.    Yes.

4     Q.    Is that true?

5     A.    Yes, the queue that we create.

6     Q.    All right.  And then down below that it says

7     Predictive Dialing.  Do you see that?

8     A.    I do see that.

9     Q.    It says, Predictive dialing refers to the

10    process of placing outbound calls, based upon the

11    prediction that an agent will be available at some time

12    in the future once a connection with a person is

13    achieved.  Is that true?

14    A.    Yes.  Those are the algorithms I was speaking

15    to earlier.

16    Q.    Okay.  And you admit that the Interaction

17    Dialer has the capacity to do that?

18    A.    The capacity to do what?

19              MR. RIGBY:  Objection.  Misstates prior

20    testimony.

21    Q.    To process the placing of outbound calls based

22    upon a prediction that an agent will be available at

23    some time in the future once a connection with a person

24    is achieved.

25    A.    I would -- I would say that it has that

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 53 of 74   PageID #: 2291

Aaron Million, Desig. Witness of
Municipal Services Bureau

332

1    capability, but not in the capacity of an ATDS system.

2        Q.    Okay.  But you admit that it has that

3    capability --

4        A.    To the --

5        Q.    -- the system that you're using?

6        A.    Only to the extent that it is not part of an

7    ATDS system.

8        Q.    All right.  So what -- what does that mean

9    exactly?

10       A.    What we talked about earlier, the TCPA defines

11   what an ATDS is.  To do the -- to do the law justice, I

12   would need to read it to -- to quote it specifically,

13   but it has to do with the generation of -- the

14   generation of random or sequential numbers to be dialed,

15   and as we noted on Exhibit 16, it does not have that

16   capacity.

17       Q.    All right.  Are you testifying that your

18   Interaction Dialer does not have the ability to perform

19   predictive dialing as defined here in this manual?

20              MR. RIGBY:  Objection to the extent it

21   calls for a legal conclusion and it's opinion testimony.

22       A.    So it -- I believe that it is able to do

23   predictive dialing to the extent that it says in the

24   manual, but limited by the statement made by AVDS in the

25   e-mail we just referenced.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 54 of 74   PageID #: 2292

Aaron Million, Desig. Witness of
Municipal Services Bureau

333

```
 1        Q.   Okay.  So it -- I see.  So it can store the

 2   numbers and then dial from the stored numbers.  That's

 3   the capability it has?

 4        A.   It can do, as you pointed out -- and I'd refer

 5   you to the manual.  It can do what the manual states, to

 6   the extent that it does not do what AVDS has indicated

 7   that it can't do.

 8        Q.   Okay.  So it cannot generate random numbers or

 9   produce random numbers, but it can predict when to call

10   the numbers that are stored by your IT people?

11                  MR. RIGBY:  Objection.  Multifarious.

12        A.   We're getting into highly technical

13   information.  I'm not an IT professional, but I will say

14   that to the extent it describes it in this manual and

15   that is limited by this e-mail, yes.

16        Q.   It has the capability to do that?

17        A.   To the --

18                  MR. RIGBY:  Objection.  Asked and

19   answered.  Same -- same objections.

20        Q.   Now, why did MSB make the decision to use such

21   a dialer?

22        A.   Well, like I said, the decision to purchase the

23   dialer was done -- was made prior to my arrival.  I

24   don't know.

25        Q.   Why do you make the decision --
```

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 55 of 74   PageID #: 2293

Aaron Million, Desig. Witness of
Municipal Services Bureau

335

1        A.    I'm sure the statement -- well, they're making

2    an opinion statement there, I believe.   It's saying it's

3    generally accepted.   I'm not sure who --

4        Q.    Okay.

5        A.    -- who all is opining.

6        Q.    All right.   Using a predictive dialer, agents

7    are connected to targeted parties for as much as 55

8    minutes per hour.   Do you see that, the next bold

9    sentence down?

10       A.    Yes.

11       Q.    Okay.   If your agents are speaking with debtors

12   more frequently, does that mean that they are able to

13   collect more money?

14       A.    Potentially, yes.

15       Q.    So MSB would make more money by use of this

16   dialer or a similar dialer.   Correct?

17             MR. RIGBY:   Objection.   Calls for

18   speculation; legal conclusion.

19       A.    Like any business, driving efficiencies will

20   help improve revenue or profitability.

21       Q.    Okay.   And then will you please turn to Page

22   191?

23       A.    Uh-huh.

24       Q.    It says, Automatic dialing and predictive

25   calculations work together to improve the efficiency of

Aaron Million, Desig. Witness of
Municipal Services Bureau

336

1    outbound call centers.  Is that true?

2        A.   It seems to me to be an opinion statement by

3    i3.  I'm sure it's true to the person who wrote it.

4        Q.   Does MSB use automatic dialing and predictive

5    calculations together to improve the efficiency of their

6    outbound call centers?

7        A.   I think we would need to dig a little bit

8    deeper into that, but as I stated before, as it relates

9    to automatic dialing or predictive dialing, we don't --

10   we don't have a system that is capable of doing those

11   functions, to the extent that they're limited by the --

12   by the TCPA and by the e-mail provided by Mr. Toppeta at

13   AVDS.

14       Q.   Your system cannot produce numbers but it can

15   store them, in other words?

16       A.   It can do precisely what's stated in the

17   e-mail.

18       Q.   All right.  And will you please turn to Page

19   192?

20       A.   Sure.

21       Q.   In the very top there it says, In predictive

22   dialing mode, outbound calls are placed based on the

23   prediction that an agent will be available once a call

24   is connected to a live person.  Do you see that?

25       A.   Yes.  But I want to read the sentence again

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

1     here.

2          Q.    All right.

3          A.    Yes.

4          Q.    All right.  Does MSB operate its i3 system in

5     predictive dialing mode?

6          A.    On -- on certain occasions, yes.

7          Q.    Okay.  What about when Mr. Sailola was called?

8          A.    It's possible.  I don't know.

9          Q.    Okay.  What other modes does it use?

10         A.    I don't know the names of all the modes.  I

11    mean --

12         Q.    Well, down below that, towards the bottom,

13    there's an Agentless Mode.  Do you see that?

14         A.    Uh-huh.

15         Q.    And the Interaction Dialer can conduct -- or

16    conduct campaigns that do not require agent

17    participation.

18         A.    Uh-huh.

19         Q.    Is that true?

20         A.    It can, yes.

21         Q.    And do you guys use that feature?

22         A.    We do.

23         Q.    Okay.  Did you use that related to

24    Mr. Sailola's case?

25         A.    I'm not sure if we did, but, of course, we had

Case 1:13-cv-00544-HG-RLP  Document 112-13  Filed 12/19/14  Page 58 of 74  PageID #: 2296

Aaron Million, Desig. Witness of
Municipal Services Bureau

338

1    consent to do so if -- if we did.

2        Q.  Is this a document that is kept in the

3    normal -- or stored in the normal course of MSB's

4    business?

5        A.  What document?

6        Q.  This one.

7        A.  It's stored as the complete manual, not just

8    this.

9        Q.  All right.  But this is part of that.  Right?

10           MR. HOLCOMB:  I think we've already --

11       A.  Stipulated that.

12           MR. HOLCOMB:  -- moved to admit that, but,

13   yeah, just to make sure.  Okay.

14           Mr. Rigby, will you stipulate to the

15   authenticity of this Bates-stamped document as well?

16           MR. RIGBY:  Sure.

17           MR. HOLCOMB:  All right.  I would like to

18   move to have this admitted as Exhibit 18?

19           THE REPORTER:  Yes.

20       Q.  All right.  Now, is this Chapter 5 of the i3

21   manual?

22       A.  That is what it says, yes.

23       Q.  All right.  And I apologize, everyone take

24   notice, they are printed on both sides.  It was very

25   voluminous.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 59 of 74     PageID
#: 2297

Aaron Million, Desig. Witness of
Municipal Services Bureau

339

1          A.    Okay.

2          Q.    But I would like you to turn to the Bates stamp

3     Page 297.

4          A.    Yes.

5          Q.    And do you see there Time Zone Blocking?

6          A.    Uh-huh.  Yes, I do.  I'm sorry.

7          Q.    And this -- this creates -- well, this

8     instructs you how to create blocking of certain time

9     zones during certain hours.  Correct?

10         A.    Yes.

11         Q.    All right.  And does MSB use that feature?

12         A.    MSB does, as I mentioned previously, have

13    controls in our telephone software to effectively

14    achieve the same result; however, I'm not sure if this

15    specific feature is how that is done.

16         Q.    Okay.  All right.  But it does use some sort of

17    software to --

18         A.    We achieve the same result.

19         Q.    -- achieve that result?

20         A.    Yes.

21         Q.    Okay.  All right.  Thank you, Mr. Million.

22                All right.  Let's move on very quickly.

23    I'd like to provide you here the next exhibit.

24                MR. HOLCOMB:  Okay.  Do you stipulate to

25    the authenticity of this, Mr. Rigby?

Exhibit "K"

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 60 of 74      PageID #: 2298

Aaron Million, Desig. Witness of
Municipal Services Bureau

340

1          MR. RIGBY:  If we produced it, we'll

2   stipulate to it.

3          MR. HOLCOMB:  All right.  Then we would

4   move to admit this as Exhibit No. 18, please.

5          THE REPORTER:  19.

6          MR. HOLCOMB:  19, please.

7     Q.   Okay.  Now, is this Chapter 6 of your manual?

8     A.   It is.

9     Q.   Okay.  Now, what are campaigns?

10    A.   It's a term used to, I guess, refer to a set of

11  calls you're going to place --

12    Q.   Okay.

13    A.   -- I guess is a way to say it.

14    Q.   And that's what your IT guys set up when they

15  get these data transfers?

16    A.   It could be an IT person or it could be a

17  collection manager, supervisor, or something.

18    Q.   All right.  What does "workflow" mean?

19    A.   Well, now -- now we're getting into some of the

20  more technical stuff.

21    Q.   Does it --

22    A.   I think I'd like to refer to the manual to kind

23  of refresh my memory on --

24    Q.   Okay.  Well, does it refer to a type of calling

25  campaign?

Exhibit "K"

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 61 of 74   PageID
#: 2299

Aaron Million, Desig. Witness of
Municipal Services Bureau

341

1      A.   I'll need to -- I'd like to refer so that I'm

2   accurate in my response.  Do you happen to know what

3   page that's -- it's dealing with here?  Or do you have

4   the index?  I can refer to the index.

5      Q.   No, I do not.

6      A.   All right.  I'll have to page through until I

7   find it.  I don't know if any -- oh, this is going to

8   workflows.  All right.  Well, there is a page called

9   "What are Workflows?"  So I can read that for you, if

10  you'd like.

11     Q.   Okay.

12     A.   Would you like me to read that page?

13     Q.   Well, I would like you to just explain what it

14  is.

15     A.   Well, I think the best explanation is going to

16  be right here in the manual.

17     Q.   Okay.

18     A.   So I'll read that.

19     Q.   All right.

20     A.   Workflows provide the capability to automate

21  how campaigns run.  Workflows address the needs of

22  customers who manage multiple campaigns and multiple

23  clients.  These call centers typically start and stop

24  campaigns based upon a variety of criteria.  For

25  example, a call center might run a campaign until a

1    quota of successful contacts is made, a sales threshold

2    is reached, until a pool of customers is polled, or

3    until the campaign is run for a specific length of time.

4    Often it is desirable to transition the same pool of

5    agents from campaign to campaign.  And then there's a

6    flow chart here, which I would need to study more if you

7    want me to --

8         Q.   All right.  Well, let me just ask you this,

9    Mr. Million:  What is -- is that definition of

10   "workflow," is that related to the term "workgroup"?

11        A.   No.  As I mentioned, those are two completely

12   separate systems, not integrated.

13        Q.   What is a workgroup?

14        A.   A workgroup is, think -- you can think of a

15   workgroup like a file folder on a Windows machine.

16        Q.   Okay.

17        A.   It's where we -- you put accounts in a file

18   folder, in a workgroup.

19        Q.   Okay.  On Exhibit 10, I noticed the -- on

20   November 4th of 2014 -- or '13, you put a legal hold

21   on --

22        A.   Are we -- are we changing exhibits?

23        Q.   Yeah.  I didn't know that they weren't related.

24   I'm sorry.

25        A.   Yeah.  We're changing exhibits.  Which exhibit?

Aaron Million, Desig. Witness of
Municipal Services Bureau

349

1        A.   What exhibit are we -- okay, so the manual,

2   8-5?

3             MR. RIGBY:  Just wait for his question.

4             THE WITNESS:  Okay.

5        Q.   I said, is it -- is it reckless to ignore those

6   recommendations based on the fact that you're a debt

7   collector rather than a telemarketer?

8             MR. RIGBY:  Objection.  Calls for a legal

9   conclusion; multifarious; vague and ambiguous.

10       A.   Yeah, our lawyer would -- would provide us with

11  guidance on how to comply with the TCPA.

12       Q.   All right.  I want to show you now the

13  complaint that was filed in this case.

14       A.   Okay.

15       Q.   All right.  Now, I would direct your attention

16  to -- oh.  And do you agree that this is the complaint

17  that was filed in this case initially?

18       A.   It appears to be.

19       Q.   Okay.

20            MR. HOLCOMB:  I would ask that that be

21  admitted as the exhibit next in order.

22       Q.   And I want to draw your attention to Page 10.

23  The subheading is Collection Calls to Mr. Sailola's

24  Cellular Telephone.

25       A.   Uh-huh.

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 64 of 74      PageID
#: 2302

Aaron Million, Desig. Witness of
Municipal Services Bureau

350

1    Q.   And from Paragraphs 51 to Paragraph 72, those

2  list specific phone calls and allege that it was made

3  via MSB's automatic telephone dialing system.   Would you

4  agree with that?

5    A.   That is what it says.

6    Q.   Okay.

7    A.   I believe there was an amended complaint filed

8  or an amended answer.

9    Q.   Now, I want to show you the next document.   It

10  was filed in this case as Docket No. 10.

11    A.   Uh-huh.

12    Q.   And it was MSB's original answer in this case.

13    A.   Uh-huh.

14    Q.   All right.

15    A.   Can you do me a favor and please wait for her

16  to hand me the exhibits?

17    Q.   Oh, I'm sorry.   I'm sorry.   All right.   So do

18  you agree that this was the original answer that was

19  filed in this case?

20    A.   The original answer, yes.

21    Q.   All right.

22          MR. HOLCOMB:   I would like to have that

23  admitted as the next exhibit in order.

24    Q.   All right.   I would draw your attention to

25  Paragraph 8 through Paragraph 29 of that document, and

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 65 of 74   PageID
#: 2303

351

Aaron Million, Desig. Witness of
Municipal Services Bureau

```
 1    it starts on Page 3.

 2        A.   Oh.  Yes.

 3        Q.   Okay.  Do you see that?

 4        A.   I do.

 5        Q.   And for each of those allegations of

 6    Paragraphs 51 through 72 in the complaint, it states,

 7    Defendant admits that on the appropriate date,

 8    Defendant, via its automatic telephone dialing system,

 9    made a telephone call and left a voice message on

10    Mr. Sailola's cellular telephone.

11        A.   Uh-huh.

12        Q.   Do you see that?

13        A.   I do.

14        Q.   Is that true?

15        A.   Well, actually, no, at least in the first

16    paragraph.  We didn't make any calls on July 2nd.  And

17    I'm not sure if automatic telephone dialing system is --

18    here is being used in the -- in the same context as the

19    TCPA.

20        Q.   All right.  So when did -- when did that

21    change?

22        A.   When did what change?

23        Q.   I'm interested in the automatic telephone

24    dialing system for each of these paragraphs that you've

25    admitted.
```

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 66 of 74   PageID
#: 2304

Aaron Million, Desig. Witness of
Municipal Services Bureau

354

```
 1    That's why we -- we have them.

 2         Q.   Why would your attorney admit that?

 3              MR. RIGBY:   Objection.  Misstates prior

 4    testimony.

 5         A.   I can't speak for my attorney.  He's -- they're

 6    highly educated legal professionals.  I can't answer

 7    that question.

 8         Q.   Why is that attorney no longer on your case?

 9              MR. RIGBY:   Don't answer that.  It's legal

10    strategy.

11              MR. HOLCOMB:   Are you asserting a

12    privilege?

13              MR. RIGBY:   I am.  Attorney-client

14    privilege.  Thank you.

15         Q.   All right.  Let me give it to the court

16    reporter.  I'm sorry, Mr. Million.  All right.  I'm

17    showing you a document now that was filed as Docket 77

18    on November 12th of 2014.  Do you see that?

19         A.   I do.

20         Q.   All right.  Are you aware of this filing?

21         A.   Yes.

22         Q.   All right.

23              MR. HOLCOMB:   We would ask that this be

24    admitted as the exhibit next in order.

25         Q.   I want to draw your attention to Page 1 of this
```

1    exhibit.

2        A.   There's two Page 1's.  The cover page or the --

3        Q.   Well, the one that's numbered Page 1.

4        A.   They're both numbered Page 1.  Page 1 and

5    Page 1.

6        Q.   Oh, okay.  Page 1 on the bottom.

7        A.   Okay.

8        Q.   All right.  And under subcategory -- or

9    Subheading A.

10       A.   Yes.

11       Q.   And it says, First, companies that engage in

12   debt collecting activities, like MSB, simply do not know

13   whether certain technology, which MSB utilizes, is or is

14   not a violation of the TCPA.  Do you see that?

15       A.   I do.

16       Q.   Is that your position, your legal position?

17       A.   I -- I have to defer to our attorney.  They

18   drafted this pleading.

19       Q.   Okay.  So you do not know whether the use of

20   this auto dialer is or is not a violation of the TCPA?

21            MR. RIGBY:  Objection.  Misstates prior

22   testimony; calls for a legal conclusion.

23       A.   Based on -- based on information that is

24   available to me, all of these things we've been talking

25   about this evening, all of the evidence points to the

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    deposition.

2        Q.   Are you -- did you use the same prerecorded

3    voice system in Ranwick as you do -- as you did when you

4    called Mr. Sailola?

5                    MR. RIGBY:   Objection.   Misstates prior

6    testimony.

7        A.   I don't know.   I would need to review all the

8    facts of Ranwick again.

9        Q.   Are you disputing that calls were made to

10   Mr. Sailola using a prerecorded voice?

11       A.   To Mr. Sailola?

12       Q.   Uh-huh.

13       A.   No, I'm not disputing that.

14       Q.   Okay.   Is that a --

15       A.   We had consent to do so.

16       Q.   Okay.   Did MSB leave voice mails for

17   Mr. Sailola?

18       A.   We did.

19       Q.   Were they automated?

20       A.   Not all of our collectors -- you have the

21   recordings -- left messages.

22       Q.   But some of them were?

23       A.   Yes.

24       Q.   How many of the automated messages were left

25   for Mr. Sailola?   You can refer to Exhibit 10.

Exhibit "K"

Aaron Million, Desig. Witness of
Municipal Services Bureau

1        A.    I've just got to find it here.  One second.

2   I'm sorry.  Things are getting a bit disorganized over

3   here.

4        Q.    Yeah.

5        A.    I don't know where it is.  Okay.  And your

6   question again?  I'm sorry.

7        Q.    On how many of these calls were automated

8   messages left for Mr. Sailola?

9              MR. RIGBY:  Objection to the extent it

10  calls for a legal conclusion.

11       A.    I'm just going to double-check my -- oh.  One

12  second.  I've just got to double-check things.  35, all

13  with consent.

14       Q.    35 --

15       A.    Recorded messages, all with consent.

16       Q.    Prerecorded messages?

17       A.    Yes.

18       Q.    Are they artificial prerecorded messages?

19              MR. RIGBY:  Objection.  Calls for a legal

20  conclusion; misstates prior testimony.

21       A.    They are not.

22       Q.    All right.  Who is the person that -- that

23  recorded those?

24       A.    I don't know in this case.  We -- we use a

25  voice talent, so she may have recorded them.  I don't

Aaron Million, Desig. Witness of
Municipal Services Bureau

1    know.

2         Q.    Okay.  All right.  But they are prerecorded.

3    Correct?

4         A.    Prerecorded human voices.

5         Q.    All right.  And on -- did that message allow

6    debtors the opportunity to stop calls without having to

7    speak?

8                    MR. RIGBY:  I'm sorry.  Could you ask that

9    again?

10        Q.    Did that message allow debtors the opportunity

11   to stop the calls without having to speak with someone

12   at MSB?

13                    MR. RIGBY:  Objection.  Misstates prior

14   testimony.

15        Q.    I'm asking if it did.

16        A.    You're asking --

17                    MR. RIGBY:  You're asking about a debtor

18   and you're referring him to Deposition Exhibit 10.  I

19   just want to make sure we're clear on what you're asking

20   him about.

21        Q.    Did the prerecorded message or does the

22   prerecorded message that was used in Mr. Sailola's case

23   allow debtors the opportunity to stop calls without

24   having to speak with someone at MSB?  In other words, is

25   there an opt-out?

Aaron Million, Desig. Witness of
Municipal Services Bureau

361

1    A.    There is -- just as the TCPA would indicate,

2    there is instructions on the message to call back and

3    request that the calls discontinue.

4    Q.    Okay.  So the debtor would have to call back

5    and speak with someone at MSB?

6    A.    Yes.

7    Q.    Okay.

8    A.    Or, I mean, I suppose they could write a letter

9    or something.  Yeah.

10   Q.    All right.  Do you use software to create these

11   messages?

12              MR. RIGBY:  Objection.  Vague and

13   ambiguous.

14   A.    I don't know how they're created.  I mean, as I

15   said, there's a -- there is a voice talent, a person,

16   who records them.

17   Q.    Did software create the messages left for Reed

18   Sailola?

19   A.    I think that's the answer -- I think that's the

20   question I just answered.  A human recorded the message.

21   Q.    Okay.  And then your software causes that

22   message to be left for Mr. Sailola?

23   A.    The telephone software delivers the message.

24   Yes.

25   Q.    Okay.

Aaron Million, Desig. Witness of
Municipal Services Bureau

365

1          MR. HOLCOMB:  I'm asking about Paragraph

2    13 where he refers to this transcript.

3        A.   I don't believe I refer to a transcript.

4        Q.   Paragraph 12.

5          MR. RIGBY:  Paragraph 12.

6        Q.   Attached hereto as Exhibit "A" is a true and

7    accurate transcription of the call --

8        A.   Oh.  Yes.

9        Q.   -- that occurred on July 8, 2013.  Correct?

10       A.   That's correct.

11       Q.   All right.  And my question is, is this

12   Document 30-2 that says Exhibit "A" at the bottom, is

13   that what you were referring to?

14       A.   Yes.

15       Q.   All right.

16          MR. HOLCOMB:  I would move to have this

17   entered as the next exhibit.

18       Q.   Now, when Mr. Sailola called, he said someone

19   from MSB had been trying to call him.  Is that true?

20       A.   Let me review the -- yes.  He stated, "I don't

21   know.  Somebody was trying to call me."

22       Q.   Okay.  And this was a call with Mr. Dorn.

23   Correct?

24       A.   That's correct.

25       Q.   All right.  And he says, "OK, your fine on that

Aaron Million, Desig. Witness of
Municipal Services Bureau

366

1  DUI, sir, is $620.61.  Will you be taking care of that

2  by credit card or debit card today?"  Is that true?

3      A.  Oh, down --

4      Q.  That's at the very bottom.

5      A.  Down the page.  Yes.  Yes.  That's correct.

6      Q.  And he said, "What was this DUI?  I thought I

7  had my attorney Jon Burge."

8      A.  Uh-huh.  Yes.

9      Q.  See that?  Okay.  And Mr. Dorn says, This is a

10  DUI impairment Breathalyzer.  It was your first offense,

11  occurred on August 7th.  And you're still located at the

12  redacted address.  Is that true?

13      A.  Is -- you're asking me if that statement is

14  true?

15      Q.  Uh-huh.

16      A.  Yes, that's what it says.

17      Q.  Is Mr. Dorn a collector for MSB?

18      A.  He is.  Yes.

19      Q.  Did Mr. Dorn ask Mr. Sailola for his attorney's

20  contact information?

21      A.  Let me see here.  No.

22      Q.  Okay.  Did MSB notify the Hawaii State

23  Judiciary about the statements Mr. Sailola had made?

24      A.  To the extent that they are documented in the

25  account notes and the -- and the judiciary has access to

Case 1:13-cv-00544-HG-RLP   Document 112-13   Filed 12/19/14   Page 74 of 74     PageID #: 2312

Aaron Million, Desig. Witness of
Municipal Services Bureau

369

1       Q.   Well, I mean, the conversation recorded in this

2   document.

3              MR. RIGBY:   Same objection.

4       A.   It would, but it's -- in this particular case,

5   we had consent from the judiciary.

6       Q.   Okay.   Is "OK, and the number we called you on

7   sir, is that a good number to reach you?" and the

8   answer, "Yes," is that sufficient to give prior express

9   consent under the TCPA?

10      A.   Yes.

11             MR. RIGBY:   Objection.   Calls for a legal

12  conclusion.

13      A.   Yes, it is.

14      Q.   Where did you learn that that was sufficient

15  consent?

16      A.   Our -- our policies and procedures are on

17  advice of legal counsel.

18      Q.   All right.   MSB's policies and procedures are

19  where you learned to -- that that was consent?

20             MR. RIGBY:   Objection.   Calls for a legal

21  conclusion.

22      A.   From the TCPA and our lawyer's guidance.

23      Q.   All right.   Why did MSB let its license with

24  the State of Hawaii, Department of Commerce & Consumer

25  Affairs, expire on June 4th of 2014?